IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**TYRONE REED SCOTT,**
*Administrator of the Estate of
Della Scott,*

        **Plaintiff,**

v.                                                                                     **Civil Action No. 3:15cv768**

**CG BELLKOR, LLC,** *et al.,*

        **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on three motions: (1) the Motion to Dismiss Non-Diverse Parties filed by Defendant Fickling Management Services ("Fickling") (the "Motion to Drop Parties"), (ECF No. 18); (2) the Motion to Dismiss for Failure to State a Claim filed by Fickling (the "Fickling Motion to Dismiss"), (ECF No. 20); and, (3) the Motion to Dismiss for Failure to State a Claim/Lack of Subject Matter Jurisdiction filed by Defendant Blue Valley Apartments, LLC ("Blue Valley") (the "Blue Valley Motion to Dismiss"), (ECF No. 22). Defendants CG Bellkor, LLC and Premier Re Fund, III LLC have not appeared in this case.

Plaintiff Tyrone Reed Scott[1] has responded to the Motion to Drop Parties, (ECF No. 24), the Fickling Motion to Dismiss, (ECF No. 26), and the Blue Valley Motion to Dismiss, (ECF No. 25). Fickling replied to Plaintiff's response to the Motion to Drop Parties, (ECF No. 28), and to Plaintiff's response to the Fickling Motion to Dismiss, (ECF No. 29). Blue Valley replied to Plaintiff's response to the Blue Valley Motion. (ECF No. 27.) Accordingly, the matters are

---

[1] Because the plaintiff in this matter, Tyrone Reed Scott, Administrator of the Estate of Della Scott, has the same last name as Della Scott, the subject of this case, the Court refers to Tyrone Reed Scott as "Plaintiff" and Della Scott as "Ms. Scott" throughout this Memorandum Opinion.

ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons that follow, the Court will grant the Motion to Drop Parties, the Fickling Motion to Dismiss, and the Blue Valley Motion to Dismiss.

## I. Factual and Procedural Background

### A. Procedural Background

Plaintiff filed two complaints in the Circuit Court for the City of Richmond. Fickling removed this case ("*Scott I*") with Blue Valley's consent, and Blue Valley removed the other, *Tyrone Scott v. CG Bellkor, LLC*, et al. ("*Scott II*"), No. 3:16cv14 (E.D. Va. filed Jan. 6, 2016), with Fickling's consent. Both defendants removed pursuant to 28 U.S.C. §§ 1441[2] and 1446,[3] asserting diversity jurisdiction under 28 U.S.C. § 1332[4] as the basis for removal.[5] Both complaints named as defendants CG Bellkor, LLC, Blue Valley Apartments, Inc., and Fickling Management Services. *Scott II* also named as a defendant Premier RE Fund, III LLC. In all other respects, the two complaints were identical. The Court consolidated the two cases into this

---

[2] Section 1441(a) provides, in pertinent part:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).

[3] Section 1446 articulates the procedure for removing civil actions from a state court.

[4] Section 1332 confers subject matter jurisdiction when the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

[5] Although Scott alleges in his Complaint that CG Bellkor, LLC and Premier RE Fund, III LLC are both citizens of Virginia, as is Scott, Fickling asserts that these two defendants are fraudulently joined, and the Court should disregard their citizenship for purposes of determining jurisdiction.

2

case number, and directed the parties to address the issue of fraudulent joinder and file responsive pleadings. (May 17, 2016 O. 3, ECF No. 17.) Fickling then filed the Motion to Drop Parties and the Fickling Motion to Dismiss, and Blue Valley filed the Blue Valley Motion to Dismiss. All motions are ripe for disposition.

### B. Summary of Allegations in the Complaint[6]

Ms. Scott, a Virginia resident, worked as a Leasing Agent at the Chamberlayne Garden Apartments (the "Apartments"). (Compl. ¶ 13.) On December 19, 2013, Ms. Scott reported to work at the Apartments' Management Office with the Apartments' Property Manager, Carolyn Chapman. During Ms. Scott's shift, a man named Benjamin Dancy entered the leasing office and asked to speak with a leasing agent who no longer worked for the Apartments. When Ms. Scott told Dancy that the leasing agent Dancy asked for no longer worked there, Dancy pulled out a knife, robbed Ms. Scott, and ushered Ms. Scott and Ms. Chapman into the bathroom adjacent to the leasing office. Dancy then stabbed Ms. Scott multiple times. Ms. Scott died from the stab wounds that night.

Before the incident on December 19, 2013, Ms. Scott had "advised [the Apartments'] Management of the criminal activity on or around [the Apartments]" and had requested that the Apartments' Management hire security to "patrol the area and protect" the employees. (Compl. ¶¶ 18, 19.)[7]

Plaintiff brings a claim of negligence against CG Bellkor, LLC, Blue Valley, Fickling, and Premier Re Fund III arising out of Ms. Scott's death. In support of his claim, Plaintiff

---

[6] For purposes of the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

[7] Although the Court consolidated *Scott I* and *Scott II* into this case, only the Complaint in *Scott II* included Premier as a defendant. Therefore, all citations to the Complaint are to the Complaint in *Scott II*, No. 3:16cv14, ECF No. 1-1.

3

asserts that all defendants: (1) "should have known that there was increased criminal activity at or surrounding the [Apartments]," (Compl. ¶ 21); (2) "had a duty to act to prevent or eliminate a known threat," (Compl. ¶ 22); (3) had additional duties to "provide adequate security, [and to] protect from foreseeable acts," (Compl. ¶ 24); and, (4) "should have known that security was necessary to patrol and protect [Ms. Scott]," (Compl. ¶ 23). Plaintiff avers that "[a]s a direct and proximate result of the negligent actions of the Defendants . . . [Ms. Scott] has suffered a loss of life, wages[,] and future income." (Compl. at 4.) Plaintiff, as the administrator of Ms. Scott's estate, sues on Ms. Scott's behalf seeking one hundred million dollars in compensatory damages and one hundred million dollars in punitive damages.

## II. Analysis: Motion to Drop Parties

Because federal courts are courts of limited subject-matter jurisdiction, if the Court lacks jurisdiction over this matter, it cannot rule on the merits of the Fickling Motion to Dismiss or the Blue Valley Motion to Dismiss. Instead, the Court must remand this case to the state court. Accordingly, the Court will address the Motion to Drop Parties first.

The Motion to Drop Parties seeks to dismiss CG Bellkor, LLC ("CG Bellkor") and Premier RE Fund, III LLC ("Premier") as fraudulently joined. (Mot. Drop Parties 2.) Fickling argues that the Court should drop CG Bellkor because it "ceased to exist as a legal entity on December 5, 2013, two weeks before the incident sued upon in this matter." (*Id.* at 3.) On May 30, 2013, CG Bellkor sold the Apartments to Blue Valley and "relinquished ownership, operations[,] and maintenance of the Apartments." (*Id.*) Therefore, "[a]s of May 30, 2013, more than six months prior to the incident complained of [in Plaintiff's Complaint], CG Bellkor no longer owned, operated[,] or maintained the Apartments." (*Id.*) Fickling contends that Premier should be dropped because it "had no interest, ownership or otherwise, and no operations or maintenance responsibilities with respect to the Apartments on December 19, 2013." (*Id.* at 4.)

4

Further, contrary to the allegations in Plaintiff's Complaint, Fickling contends that "Premier did not "merge with or purchase stock" or "assume the debts and/or liabilities" of either CG Bellkor or Blue Valley. (*Id.*)

Thus, according to Fickling, the important dates and events are as follows:

| | |
|---|---|
| May 30, 2013: | CG Bellkor sold the Apartments |
| May 30, 2013: | Blue Valley bought the apartments |
| December 5, 2013: | CG Bellkor ceased to exist as a legal entity |
| December 19, 2013: | Ms. Scott murdered at the Apartments |
| May 15, 2014: | Premier formed as a corporate entity |
| July 28, 2014: | Premier first acquired an interest in the Apartments |

In support of its Motion to Drop Parties, Fickling refers to the Notice of Cancellation of Existence of CG Bellkor, LLC (the "Notice of Cancellation"), (ECF No. 1-3), and the Substitute Trustee's Deed (the "Deed"), (ECF No. 1-4), both of which were attached to Fickling's Notice of Removal, and attaches the Affidavit of Jonathan Cutler, Manager of Premier RE Fund III LLC (the "Cutler Affidavit"), (ECF No. 19-1). The Notice of Cancellation comes from the Commonwealth of Virginia State Corporation Commission Office of the Clerk and states that, because the Commission did not receive CG Bellkor's annual registration fee on or before November 30, 2013, CG Bellkor's "existence was automatically canceled as of that date." (Notice Cancellation 1.) The cancellation means that CG Bellkor "is no longer authorized to transact business and its properties and affairs have passed automatically to its managers, members, or holders of its interests as trustees in liquidation." (*Id.*) The Deed, dated June 14, 2013, indicates that CG Bellkor defaulted on a Note, which was secured by the Apartments. (Deed of Trust ¶ A.) On November 8, 2012, Fannie Mae accelerated the Note and loan, and appointed a substitute trustee who sold the property at a public auction on May 30, 2013. (*Id.* ¶¶ C–E.) Fannie Mae bought the property at auction and sold it to Blue Valley. (*Id.* ¶ F, G.)

The Affidavit of Jonathan Cutler outlines the lack of relationship between Premier and CG Bellkor or Blue Valley. Cutler, the Manager of Premier RE Fund III LLC, attests that Premier formed as a corporate entity on May 15, 2014, and first acquired an ownership interest in the Apartments on July 28, 2014. Cutler states that Premier "acquired Chamberlayne Garden Apartments from Blue Valley Apartments, Inc. through a traditional real estate purchase agreement, with no consideration or contemplation of merging, purchasing stock[,] or assuming the debts and/or liabilities of Blue Valley Apartments, Inc., or any other entity." (Cutler Aff. ¶ 8.) Specifically, Cutler swears that Premier "did not merge with or purchase stock" and "did not, at any time, assume the debts and/or liabilities" of Blue Valley. (*Id.* ¶¶ 9, 10.) Cutler vows that Premier "does not now, nor has it ever had, [sic] any relationships or conducted any transactions, business or otherwise, with CG Bellkor." (*Id.* ¶ 4.) Premier "did not merge with or purchase stock" and "did not, at any time, assume the debts and/or liabilities" of CG Bellkor. (*Id.* ¶¶ 5, 6.) Cutler affirms that Premier "had no interest, ownership or otherwise, and no operations or maintenance responsibilities with respect to Chamberlayne Garden Apartments as of December 19, 2013." (*Id.* ¶ 11.)

Plaintiff offers no evidence to rebut the Cutler Affidavit, the Notice of Cancellation, or the Deed. Plaintiff concedes that "there is no dispute about when Premiere [sic] acquired the subject property," but argues that Premier's lack of interest in the Apartments at the time of Ms. Scott's death "does not preclude Premier from being held liable." (Pl.'s Resp. Mot. Dismiss Parties 3, ECF No. 24.) Plaintiff contends that "just because CG Belkor [sic] owned the land before the incident does not necessarily indicate that CG Belkor [sic] relinquished all responsibilities." (*Id.*) Plaintiff further states that "Plaintiff is uncertain as to whether or not the acquisition by Premiere [sic] was an outright land transfer, a stock/asset purchase, or if Premier

6

assumed any responsibilities for handling debts and/or claims against the party before they acquired ownership." (*Id.* at 4.) Plaintiff presents nothing to support his bald speculations that the information in the Cutler Affidavit is incorrect.

### A. Removal Jurisdiction

Under 28 U.S.C. § 1441(a),[8] a defendant may remove a civil action to a federal district court if the plaintiff could have originally brought the action in federal court. 28 U.S.C. § 1441(a). Section 1446 delineates the procedure for removal, including the requirement that the defendant file a notice of removal in the district court and the state court. *See* 28 U.S.C. §§ 1446(a), (d). The state court loses jurisdiction upon the removal of an action to federal court. 28 U.S.C. § 1446(d) ("[T]he State court shall proceed no further unless and until the case is remanded.").

"The party seeking removal bears the initial burden of establishing federal jurisdiction." *Abraham v. Cracker Barrel Old Country Store, Inc.*, Civil Action No. 3:11cv182, 2011 WL 1790168, at *1 (E.D. Va. May 9, 2011) (citing *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994)). No presumption favoring the existence of federal subject matter jurisdiction exists because federal courts have limited, not general, jurisdiction. *Id.* (citing *Pinkley Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999)). Courts must construe removal jurisdiction strictly. *Id.* (citing *Mulcahey*, 29 F.3d at 151). "If federal jurisdiction is doubtful, a remand is necessary." *Id.* (quoting *Mulcahey*, 29 F.3d at 151).

---

[8] Section 1441(a) provides in pertinent part:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).

7

Federal diversity jurisdiction requires complete diversity of citizenship. *Id.* at *2 (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990)); *see also* 28 U.S.C. § 1332(a)(1). "[T]he 'citizenship of each plaintiff [must be] diverse from the citizenship of each defendant.'" *Abraham*, 2011 WL 1790168, at *2 (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (second alteration in original)).

### B. The Fraudulent Joinder Doctrine

The fraudulent joinder doctrine operates as an exception to the complete diversity requirement, permitting a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, and dismiss the nondiverse defendants, thereby retaining jurisdiction. *Id.* (citing *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999)). "To show fraudulent joinder, the removing party must demonstrate either 'outright fraud in the plaintiff's pleading of jurisdictional facts' or that 'there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court.'" *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (alteration in original) (quoting *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993)). "The party alleging fraudulent joinder bears a heavy burden—it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Id.* "This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)." *Id.* A defendant is fraudulently joined "if there is no 'reasonable basis for predicting that state law might impose liability on the facts involved.'" *Pham v. Bank of N.Y.*, 856 F. Supp. 2d 804, 809 (4th Cir. 2012) (quoting *Boss v. Nissan N. Am., Inc.*, 228 F. App'x 331, 335 (4th Cir. 2007)). The Court is not bound by the allegations in the pleadings, but can consider the entire record. *Mayes*, 198 F.3d at 464.

### C. The Court Will Dismiss CG Bellkor and Premier as Fraudulently Joined

The Court will dismiss CG Bellkor and Premier from the action because they were fraudulently joined. Plaintiff cannot establish a claim of negligence—the only claim Plaintiff asserts—against CG Bellkor or Premier, even after resolving all issues of fact and law in Plaintiff's favor. *See Hartley*, 187 F.3d at 424.

#### 1. Plaintiff Cannot Establish a Claim of Negligence Against CG Bellkor

Plaintiff cannot establish a claim of negligence against CG Bellkor arising out of Ms. Scott's death on December 19, 2013. In order to establish a claim of negligence, a plaintiff has "the burden to show the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage." *Atrium Unit Owner's Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003) (citing *Fox v. Custis*, 372 S.E.2d 373, 375 (Va. 1988); *Trimyer v. Norfolk Tallow Co., Inc.*, 66 S.E.2d 441, 443 (Va. 1951)); *see Delk v. Columbia/HCA Healthcare Corp.*, 523 S.E.2d 826, 830 (Va. 2000). "Before any duty can arise with regard to the conduct of third persons, [as Plaintiff alleges here,] there must be a special relationship between the defendant and either the plaintiff or the third person." *A.H. v. Rockingham Pub. Co., Inc.*, 495 S.E.2d 482, 485 (Va. 1998).

Plaintiff cannot establish a claim of negligence against CG Bellkor because Plaintiff cannot establish that, at the time of Ms. Scott's death, CG Bellkor owed Ms. Scott any duty to protect her from harm by third parties. On November 8, 2012, after CG Bellkor defaulted on a loan secured by the Apartments, Fannie Mae accelerated the Note and loan. (Deed of Trust ¶ C.) On May 30, 2013, the substitute trustee foreclosed on the Apartments, and Fannie Mae bought them in the sale and sold the Apartments to Blue Valley. (*Id.* ¶¶ D–F.) Thus, as of May 30, 2013, "CG Bellkor relinquished ownership, operations[,] and maintenance of the Apartments." (Mem. Supp. Mot. Drop Parties 6.) Plaintiff's negligence claim relies on the assertions that

9

Defendants had "a duty to provide adequate security, a duty to protect from foreseeable acts, and to prevent or eliminate a known threat." (Compl. ¶ 24.) CG Bellkor had no involvement in the operation of the Apartments for at least six months before Ms. Scott's death and therefore had no ability to control the security or threats existing at the Apartments on December 19, 2013. Moreover, it had no "special relationship" with Ms. Scott on December 19, 2013, that would impart upon CG Bellkor a duty to protect her from harm by a third party. *See Rockingham*, 495 S.E.2d at 485 ("Examples of [a special relationship] include common carrier-passenger, business proprietor-invitee, . . . innkeeper-guest[, and] . . . employer-employee . . . .").

Even after resolving all issues of fact and law in Plaintiff's favor, Plaintiff cannot establish a claim of negligence against CG Bellkor. *See Hartley*, 187 F.3d at 424. The Court will dismiss CG Bellkor from the action.

### 2. Plaintiff Cannot Establish a Claim of Negligence Against Premier

Plaintiff cannot establish a claim of negligence against Premier arising out of Ms. Scott's death on December 19, 2013. Because Ms. Scott's injury occurred on December 19, 2013, to establish a claim of negligence against Premier arising out of Ms. Scott's death, Plaintiff would have to show that, on December 19, 2013, Premier owed Ms. Scott a legal duty, Premier breached that duty, and Premier's breach of its duty proximately caused Ms. Scott's death. *See King*, 585 S.E.2d at 548. The uncontroverted evidence, however, shows that Premier did not even form as a corporate entity until May 15, 2014. Further, Premier had no interest in the Apartments until July 28, 2014, when it purchased the Apartments from Blue Valley. Because Premier did not exist as a legal entity until five months after Ms. Scott's death, and had no interest in the Apartments until more than seven months after Ms. Scott's death, Plaintiff cannot establish that Premier owed any duty to Ms. Scott at the time of her death. Plaintiff therefore

cannot establish a claim of negligence against Premier arising out of Ms. Scott's death.

Plaintiff also cannot establish a negligence claim against Premier based on his allegation that "Premier assumed the debts and liability of CG Bellkor" or Blue Valley.[9] (Compl. ¶¶ 11, 12.) The uncontroverted evidence again shows that Premier did not assume the debts and liabilities of either CG Bellkor or Blue Valley. Premier's purchase of the Apartments constituted "a traditional real estate purchase," and Premier never "merge[d] with or purchase[d] stock of Blue Valley" and "did not, at any time, assume the debts and/or liabilities of Blue Valley." (Cutler Aff. ¶¶ 8–10.) Furthermore, Premier has never had "any relationship or conducted any transactions, business or otherwise, with CG Bellkor." (Id. ¶ 4.) Premier "did not merge with or purchase stock of CG Bellkor" nor did it "at any time, assume the debts and/or liabilities of CG Bellkor." (Id. ¶ 6.)

Plaintiff's assertion that "Plaintiff is uncertain as to whether or not the acquisition by Premiere [sic] was an outright land transfer, a stock/asset purchase, or if Premier assumed any responsibilities for handling debts and/or claims against the party before they acquired ownership," (Pl.'s Opp'n Mot. Dismiss Parties 4), does not affect the Court's conclusion. Plaintiff presents no evidence to counter the sworn statements of Jonathan Cutler. The Court

---

[9] Plaintiff's Complaint contains no allegation that Premier assumed Blue Valley's debts and liabilities. Rather, the Complaint contains the following two paragraphs:

> 11. As a result of the merger and/or stock purchase between CG Bellkor and PREMIER, PREMIER assumed the debts and liabilities of CG Bellkor.
>
> 12. As a result of the merger and/or stock purchase between Blue Valley Apartments and PREMIER, PREMIER assumed the debts and liabilities of CG Bellkor.

(Compl. ¶¶ 11, 12.) Taking these paragraphs together, the Court sees a likely copy-and-paste error by Plaintiff's counsel. For the purposes of deciding the Motion to Drop Parties, the Court will assume that Plaintiff intended to refer to Blue Valley throughout the entirety of paragraph 12.

will disregard Plaintiff's conclusory, unsupported allegations that directly contradict evidence before the Court.

Because the evidence shows that Premier did not exist, had no interest in the Apartments, and owed Ms. Scott no duty of care at the time of her death, Plaintiff cannot establish a claim of negligence against Premier, even after resolving all issues of fact and law in Plaintiff's favor. *See Hartley*, 187 F.3d at 424. The Court will dismiss Premier from the case.

### D. The Court Exercises Diversity Jurisdiction Over Plaintiff's Claim

After dismissing Premier and CG Bellkor from the action, Plaintiff, Fickling, and Blue Valley remain. Plaintiff brings the claim on behalf of Ms. Scott, who "was a Virginia resident." (Compl. ¶ 1.) Fickling is a limited liability company organized under the laws of Georgia with its principal place of business in Georgia. "Fickling was not and is not now a citizen of the Commonwealth of Virginia." (Not. Removal ¶ 8, ECF No. 1.) Blue Valley is a corporation incorporated in Florida with its principal place of business in Florida. Blue Valley "was not and is not now a citizen of the Commonwealth of Virginia." (*Id.* ¶ 11.) Plaintiff seeks one hundred million dollars in compensatory damages and one hundred million dollars in punitive damages. Thus, the Court exercises diversity jurisdiction over Plaintiff's claim because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

### III. Analysis: Motion to Dismiss

Both Fickling and Blue Valley (collectively, the "Defendants") bring their Motions to Dismiss under both Federal Rule of Civil Procedure 12(b)(1)[10] and Federal Rule of Civil

---

[10] Rule 12(b)(1) provides that a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1).

Procedure 12(b)(6).[11] The Defendants argue that the Virginia Workers' Compensation Act (the "VWCA"), Va. Code §§ 65.2-100 *et seq.*, provides Plaintiff's exclusive remedy and thereby bars his claim, and that Plaintiff fails to allege facts that establish either Fickling or Blue Valley owed Ms. Scott a duty to warn or protect Ms. Scott from Dancy's actions. The Court agrees with the Defendants. Plaintiff's exclusive remedy lies in the VWCA, which bars him from seeking redress in this Court. Lacking jurisdiction, the Court will dismiss Plaintiff's Complaint.

### A. Motion to Dismiss for Lack of Subject-Matter Jurisdiction Standard

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenging the Court's subject-matter jurisdiction, the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper.[12] *See Int'l Longshoremen's Ass'n v. Va.*

---

[11] Rule 12(b)(6) provides that a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[12] The Court notes that "some confusion persists in the Fourth Circuit as to whether the Virginia Workers' Compensation Act (the "VWCA"), Va. Code §§ 65.2-100 *et seq.*, truly constitutes a jurisdictional bar in disputes involving workplace injury." *Miller v. Stratford House Ret. Cmty.*, No. 4:12cv6, 2012 WL 1414850, at *6 (W.D. Va. Apr. 24, 2012). This Court chooses to follow the weight of authority in the Fourth Circuit, the Commonwealth of Virginia, and this District by addressing the VWCA's exclusivity provisions as a jurisdictional bar appropriately dismissed on a motion under Federal Rule of Civil Procedure 12(b)(1). *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271 (4th Cir. 2015) (affirming district court's dismissal under Rule 12(b)(1) for lack of subject-matter jurisdiction and expressly declining to decide whether Rule 12(b)(6) or Rule 12(b)(1) provided the proper standard under which to evaluate whether the VWCA barred the claim because "the outcome would be the same regardless"); *Banks v. Va. Elec. & Power Co.*, 205 F.3d 1332, at *2 (4th Cir. 2000) (affirming district court's dismissal under Rule 12(b)(1) and "find[ing] no merit to plaintiff's contention that the district court improperly utilized Rule 12(b)(1) to dismiss his action"); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 650 (4th Cir. 1999) (affirming district court's dismissal under Rule 12(b)(1) and "agree[ing] with the district court's conclusion that [plaintiff's] sole remedy against [defendants] is pursuant to the VWCA"); *Miller*, 2012 WL 1414850, at *6 n.5 (recognizing the disagreement but finding that "treating the matter as jurisdictional under Rule 12(b)(1) is appropriate because the underlying facts of Plaintiff's claim for work-related injury appear largely undisputed"); *Miller v. Wash. Workplace, Inc.*, 298 F. Supp. 2d 364, 371 (E.D. Va. 2004) (granting defendants' motion to dismiss under Rule 12(b)(1) and "hold[ing] that [the court] does not have jurisdiction over" intentional tort claims because the VWCA "provides the exclusive remedy" for plaintiff's injuries); *Coulter v. United States*, 256 F. Supp. 2d 484, 486 (E.D. Va. 2003) ("The proper

13

*Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) can attack subject-matter jurisdiction in two ways. First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject-matter jurisdiction can lie. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a challenge, a court assumes the truth of the facts alleged by plaintiff, thereby functionally affording the plaintiff the same procedural protection he or she would receive under Rule 12(b)(6) consideration. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219.

A Rule 12(b)(1) motion may also challenge the existence of subject-matter jurisdiction in fact, apart from the pleadings. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a case, because a party challenges the court's "'very power to hear the case,'" the trial court is free to weigh evidence to determine the existence of

---

vehicle for challenging subject matter jurisdiction in light of the VWCA's exclusivity provision is a motion to dismiss pursuant to Rule 12(b)(1)."). *But see Graves v. Cook*, No. 7:01cv533, 2002 WL 598416, at *1 n.1 (treating a motion to dismiss based on VWCA's exclusivity provision under Rule 12(b)(1) as a motion to dismiss under Rule 12(b)(6) in part because "[i]f the court were to consider the [VWCA's] bar as a jurisdictional question, then the Virginia general Assembly would effectively determine the limits of federal jurisdiction"); *Sutter v. First Union Nat. Bank of Va., Inc.*, 932 F. Supp. 753, 760, 758 (E.D. Va. 1996) (granting defendants' motion to dismiss under Rule 12(b)(6) because plaintiff was "precluded by the [VWCA]'s exclusive remedies provision . . . from seeking redress for her personal injuries in this court," but also noting that "[i]f an injury is covered by the [VWCA] . . . jurisdiction is vested solely in the Industrial Commission of Virginia.").

Even if this Court were to examine Defendants' Motions to Dismiss under Rule 12(b)(6), "the outcome would be the same regardless." *See Demetres*, 776 F.3d at 272 n.1. For the purposes of their Motions to Dismiss, Defendants do not dispute the facts alleged in the Complaint. And even under a Rule 12(b)(6) analysis, the VWCA prohibits Plaintiff "from seeking redress for [Ms. Scott's] personal injuries in this court," and dismissal would be proper. *See Sutter*, 932 F. Supp. at 760.

jurisdiction. *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *See id.*; *see also Adams*, 697 F.2d at 1219.

The Court will evaluate the Defendants' Motions as facial attacks on the Complaint. The Court therefore will assume the truth of the facts alleged by Plaintiff and afford him the same procedural protection he would receive under Rule 12(b)(6) consideration. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338.

### B. The VWCA Provides Plaintiff's Exclusive Remedy for Ms. Scott's Death

The VWCA provides rights and remedies to an employee who suffers an "injury by accident arising out of and in the course of the employment." Va. Code § 65.2-101. An employee's rights and remedies under the VWCA "shall exclude all other rights and remedies of such employee, [or] his personal representative . . . at common law or otherwise." Va. Code § 65.2-307. Thus, an employee who has been injured "by accident arising out of and in the course of" his or her employment has remedies for that injury only under the VWCA and cannot sustain a common law claim for the same injury. *See* Va. Code §§ 65.2-101, 65.2-307. The Court therefore must determine whether Ms. Scott's death amounted to: (1) an injury by accident; (2) arising out of; and, (3) in the course of, her employment. *Combs v. Va. Elec. & Power Co.*, 525 S.E.2d 278, 281 (Va. 2000).

15

1. **Injury by Accident**

Plaintiff appropriately concedes that Ms. Scott's death "was an injury by accident" under the VWCA. (Pl.'s Brs. Opp'n 4–5, ECF Nos. 25, 26.)[13] Under the VWCA, "an injury by accident occurs when the injury appears suddenly at a particular time and place, and upon a particular occasion; when it is caused by an identifiable incident, or sudden precipitating event; and when the injury results in an obvious mechanical or structural change in the human body." *Id.* (internal quotation marks and alterations omitted). Even though Ms. Scott's death resulted from an intentional act, intentional torts may constitute accidents under the VWCA. *Cont'l Life Ins. Co. v. Gough*, 172 S.E. 264, 266 (Va. 1934) ("[I]t is now well settled by unanimity of decisions . . . that although the injury is the result of the wilful [sic] and intentional assault of either a fellow-employee or a third person, this fact does not prevent the injury from being accidental within the meaning of the act."). Ms. Scott's death resulted from an identifiable incident at a particular time and place. As such, her death constitutes an "injury by accident" under the VWCA.

2. **Arising Out of Employment**

An injury "arises out of" employment "when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury." *Combs*, 525 S.E.2d at 282 (citation omitted). The VWCA applies to injuries that "can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment." *Id.* It

---

[13] The briefs that Plaintiff submitted in response to the Fickling Motion to Dismiss and the Blue Valley Motion to Dismiss were almost identical. (*Compare* Pl.'s Br. Opp'n Fickling Mot. Dismiss, ECF No. 25, *with* Pl.'s Br. Opp'n Blue Valley Mot. Dismiss, ECF No. 26.) Therefore, all citations to Plaintiff's response briefs refer to both response briefs, unless the Court indicates otherwise.

excludes, however, injuries "which cannot fairly be traced to the employment as a contributing proximate cause and which come[] from a hazard to which the workmen would have been equally exposed apart from the employment." *Id.* For an injury to "arise out of" employment,

> [t]he causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence.

*Id.* (emphasis added).

To determine whether an injury arises out of employment, Virginia applies the "actual risk" test, "meaning that the employment must expose the employee to the particular danger causing the injury, notwithstanding the public's exposure generally to similar risks." *Id.* "If the assault is personal to the employee and not directed against him as an employee or because of his employment, the injury does not arise out of the employment." *Richmond Newspapers, Inc. v. Hazelwood*, 457 S.E.2d 56, 58 (Va. 1995). Because the assault against Ms. Scott "had its origin in a risk connected with the employment, and . . . flowed from that source as a rational consequence," *Combs*, 525 S.E.2d at 282, and was not "personal to [Ms. Scott but was] directed against [her] as an employee or because of [her] employment," *Hazelwood*, 457 S.E.2d at 58, Ms. Scott's death "arose out of" her employment.

Plaintiff asserts that when Dancy entered the Apartments' leasing office, he asked to speak with someone who had previously, but no longer, worked at the Apartments. Dancy's request indicates that he came to the leasing office to see someone *other* than Ms. Scott, but someone whom he believed would be at the office because he believed that person worked there. Once Dancy learned that this person was not there, he attacked Ms. Scott. His attack, however, was not directed only at Ms. Scott. Dancy directed both Ms. Scott and Ms. Chapman, the only

17

other employee present at the time, into the bathroom in the office. Although Plaintiff alleges that Ms. Scott was stabbed, and includes no information that Ms. Chapman suffered similar injuries, the facts indicate that Ms. Scott was targeted because of her status as an employee, not because of anything personal to her. All allegations in Plaintiff's Complaint, viewed in the light most favorable to Plaintiff, indicate that Dancy's attack of Ms. Scott was not ""personal to [Ms. Scott but was] directed against [her] as an employee or because of [her] employment." *See Hazelwood*, 457 S.E.2d at 58 (finding that the practice of "goosing" fellow employees was personal and not directed at individuals in their capacity as employees or in furtherance of the employer's business).

The cases Plaintiff cites to the contrary fail to persuade the Court otherwise. Plaintiff identifies *Reamer v. Nat'l Serv. Indus., Inc.*, 377 S.E.2d 627 (Va. 1989) as "[p]erhaps the most similar to the present case."[14] (Pl.'s Brs. Opp'n 9.) In *Reamer*, a man wearing a ski mask forced his way into the furniture rental store where Ms. Reamer worked. *Reamer*, 377 S.E.2d at 628. He instructed Ms. Reamer, "Don't look at me," and asked if anyone was in the store. *Id.* After Ms. Reamer said she was alone in the store, he "held a knife to her throat, shoved her into the

---

[14] The other two cases to which Plaintiff points, *Butler v. S. States Coop., Inc.*, 620 S.E.2d 768 (Va. 2005) and *Hilton v. Martin*, 654 S.E.2d 572 (Va. 2008) are remarkably distinct from this case. Both cases involved assaults against employees by co-workers while at work. *Butler*, 620 S.E.2d at 770, *Hilton*, 654 S.E.2d at 573. *Butler* involved a sexual assault by a coworker who "frequently made personal comments to Butler, including comments that he wanted 'to date' her." 620 S.E. 2d at 770. *Hilton* involved a physical assault by a coworker who, holding defibrillator paddles in his hands, approached his coworker saying, "'I'm going to get you,'" and then shocked his coworker, killing her. 654 S.E.2d at 573. The *Hilton* court found that, "[w]hether intended as flirtatious, merely playful, or as harassment, [the assault] was purely personal." *Id.* at 575.

These cases differ materially from the case at bar. Both *Butler and Hilton* involved a victim and an assailant who knew each other and worked together; and both involved an incident that was directed at the ultimate victim from inception until completion. In this case, Ms. Scott and Dancy had no prior relationship, and no previous interactions. Further, Dancy entered the management office looking for someone else. Although he ultimately attacked Ms. Scott, she clearly was not his originally intended victim.

bathroom, closed the door behind him, and raped and sodomized [her.]" *Id.* The attacker then left Ms. Reamer in the bathroom, took money from her purse, and returned to the bathroom and sexually assaulted Ms. Reamer again. *Id.* He left, warning Ms. Reamer that he would kill her and her children if she reported the assault. *Id.* Ms. Reamer heard him rummaging through things in the store, and learned later that he had stolen checks and cash from the store. *Id.*

The *Reamer* court held that Ms. Reamer's attack did not arise out of her employment because "the multiple sexual assaults Ms. Reamer suffered were purely personal in nature, both in motivation and in consummation." *Id.* at 630. In reaching this conclusion, the court relied in part on the facts that "[t]he assailant, a customer, was *personally acquainted* with Ms. Reamer. He had *talked with her in the store* on several occasions. On the day of the assault, his first inquiry was whether he and his intended victim were alone. . . . [And] behind a closed door, he forced her to submit to sexual relations." *Id.* (emphases added). In contrast, Plaintiff's Complaint contains no allegations that Dancy had any personal acquaintance or prior interactions with Ms. Scott. Plaintiff's Complaint lacks any assertion that, at the time Dancy entered the management office, Ms. Scott was his intended victim. Rather, Plaintiff's Complaint indicates that Dancy came to the management office looking for *someone other than* Ms. Scott.[15] Finally, the multiple stab wounds Ms. Scott suffered were not as "purely personal in nature" as a sexual assault.

---

[15] Plaintiff asserts that "at the very least, Dancy's intended personal attack on the ex-employee was transferred to Scott." (Pl.'s Brs. Opp'n 11.) Plaintiff cites no authority for this supposed transfer of intent, and the Court finds none. Further, even if the Court were to accept Plaintiff's theory regarding transferred intent, the alleged facts suggest that Dancy's attack "transferred to Scott" "as an employee or because of [her] employment," *Hazelwood*, 457 S.E.2d at 58, and not because of anything personal to Ms. Scott. Thus, even under Plaintiff's "transferred intent" theory, circumstances indicate that Ms. Scott's injury arose out of her employment.

### 3. In the Course of Employment

Plaintiff also concedes that Ms. Scott's death occurred in the course of her employment. (Pl.'s Brs. Opp'n 5.) An injury occurs in the course of employment "when it takes place within the period of the employment, at a place where the employee may reasonably be, and while he is reasonably fulfilling duties of his employment or engaged in doing something incidental thereto." *Combs*, 525 S.E.2d at 283. Ms. Scott's death resulted from injuries she suffered at work during her normal working hours, as she fulfilled her duties of employment, and in a place where she reasonably was allowed to be. As such, her death occurred "in the course of employment" under the VWCA.

## IV. Conclusion

For the foregoing reasons, the Court the Court will grant the Motion to Drop Parties, the Fickling Motion to Dismiss, and the Blue Valley Motion to Dismiss. The Court will dismiss the Complaint.[16]

/s/
M. Hannah Lauck
United States District Judge

Date: 3/27/2017
Richmond, Virginia

---

[16] Given its lack of jurisdiction, the Court need not reach Defendants' alternative argument, that Plaintiff cannot state a claim for negligence because Defendants owed Ms. Scott no duty to protect her from Dancy's criminal acts. The Court notes, however, that even viewing Plaintiff's Complaint in the light most favorable to Plaintiff, he likely would fail to state a claim upon which relief could be granted. The Court thinks it unlikely that Plaintiff's claim could survive an analysis of whether Dancy's attack constituted a "known or reasonably foreseeable" third party criminal act about which Ms. Scott's employer had a duty to warn or protect. *See Virginia v. Peterson*, 749 S.E.2d 307, 311 (Va. 2013).